**Opinion issued July 28, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00874-CV

————————————

## IN THE INTEREST OF R.H., M.D.J., AND M.K., CHILDREN

———————————————————————————————————————

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 74587**

———————————————————————————————————————

## MEMORANDUM OPINION

After a bench trial, the trial court terminated the parental rights of appellant, D.K., to her minor children, R.H., M.D.J., and M.K., named the Texas Department of Family and Protective Services ("DFPS") sole managing conservator of R.H. and M.K., and named M.D.J.'s father sole managing conservator of M.D.J. *See* TEX. FAM. CODE ANN. § 161.001 (West 2014). In nine issues on appeal, D.K.

challenges whether the evidence was legally and factually sufficient to support the termination of her parental rights and whether she was denied counsel when the trial court permitted her counsel to withdraw, refused to appoint new counsel to represent her, and granted a contest to her affidavit of indigence.  We affirm.

## Background

On January 29, 2013, DFPS received a referral alleging that D.K. had engaged in neglectful supervision of R.H., M.D.J., and M.K.  On February 4, 2013, DFPS filed an "Original Petition in Intervention for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship."  In the petition, which was filed in Harris County, DFPS sought termination of D.K.'s parental rights to her son, M.D.J.  The trial court signed an "Order for Protection of a Child in an Emergency and Notice of Hearing" that same day, appointing DFPS as the temporary sole managing conservator of M.D.J. The trial court further found that D.K. was indigent and appointed attorney Ricardo Ramos to represent her.  Finally, the trial court set February 10, 2014 as the dismissal date for this case.

In March 2013, DFPS created a Family Service Plan for D.K.

On August 22, 2013, the Harris County court transferred the case to Brazoria County.

2

On November 21, 2013, Ramos filed a motion to withdraw as counsel. The trial court granted the motion on November 26, 2013. The trial court appointed new counsel, Toni Kersey, on December 12, 2013.

On January 9, 2014, the trial court signed an "Order Retaining Suit on Court's Docket and Setting Hearing Dates," extending the dismissal date for the case to August 11, 2014.

DFPS filed a first amended petition on March 28, 2014, seeking to terminate D.K.'s parental rights to R.H., M.D.J., and M.K.

On May 28, 2014, attorney Kersey filed a "Motion for Withdrawal of Counsel."

On June 4, 2014, DFPS filed a "Second Amended Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." DFPS sought to terminate D.K.'s parental rights to R.H., M.D.J., and M.K., based on allegations that D.K.: (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(1)(D), Texas Family Code;" (2) "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E), Texas Family Code;" and (3) "failed to comply with the provisions of a court order

3

that specifically established the actions necessary for the mother to obtain the return of the child . . ., pursuant to § 161.001(1)(O), Texas Family Code."

On July 17, 2014, the case was called to trial and witnesses were sworn. The case was continued until September 29, 2014.

On August 18, 2014, DFPS filed a third amended petition, which DFPS admitted at the trial on September 29, 2014, was a trial amendment, again seeking to terminate D.K.'s parental rights and adding several allegations as bases for termination.

The trial court held a bench trial on September 29, 2014. At the conclusion of the hearing, the trial court found the allegations under Texas Family Code section "161.001, Grounds D, E, and O to be true" and found "that the best interest of the children will be served by terminating the parent-child relationship [sic] as they exist between the three children and" D.K. The trial court then appointed DFPS as the permanent managing conservator of R.H. and M.K. and appointed M.D.J.'s father as the permanent managing conservator of M.D.J.

On October 17, 2014, the trial court signed a "Final Order in Suit Affecting the Parent-Child Relationship." In the order, the trial court found that D.K. (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(1)(D), Texas Family Code;" (2) "engaged in

4

conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E), Texas Family Code;" and (3) "failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children . . ., pursuant to § 161.001(1)(O), Texas Family Code." The trial court further found that termination of D.K.'s parental rights was in the best interest of the children. The trial court therefore terminated D.K.'s parental rights to R.H., M.D.J., and M.K.

On October 28, 2014, D.K., through counsel Blair Parker, timely filed a notice of appeal and a motion for new trial.

On November 6, 2014, D.K. filed a "Motion for Court Appointed Attorney for Appeal Under TFC §107.013," arguing that Parker "was hired by a Good Samaritan to represent [D.K.] solely on a Motion for New Trial" and that she was still indigent. D.K. attached an affidavit of indigency to her motion.

The court reporter filed a contest to D.K.'s affidavit of indigence on November 7, 2014, and DFPS contested D.K.'s claim of indigence on November 10, 2014.

The trial court signed an "Order Granting Contest to Affidavit of Indigence" on December 8, 2014, finding that the "original order of indigency is deemed a

void order . . . based on the fact that there is no affidavit of indigency of [D.K.] filed in the records of this cause."

On December 17, 2014, the trial court denied the motion for new trial.

### D.K.'s Representation at Trial

After the case was called for trial, but before evidence began, D.K.'s appointed attorney, Toni Kersey, informed the trial court that she had a matter to put on the record. Kersey stated:

> As I informed the Court, Your Honor, my client, [D.K.], has decided she would like to represent herself. She feels that she is the only one that can best put forth her case to you. I have advised her on numerous occasions of settlement offers that were, in my professional opinion, in her best interest, and she has declined those. She has insisted on going forward with the trial on her behalf, representing herself. . . . At this point, she wants to represent herself, Your Honor.

The trial court then questioned D.K.:

> The Court: Is that accurate, [D.K.]?
> [D.K.]: Yes, sir.
> The Court: [D.K.], have you – what's the highest grade level that you achieved?
> [D.K.]: Ninth grade.
> The Court: Did you leave school?
> [D.K.]: I got pregnant with my first child.
> The Court: Did you ever go back and get your G.E.D.?
> [D.K.]: Yes.
> The Court: After you got your G.E.D., did you ever get any college courses?
> [D.K.]: I just enrolled in college this year.
> The Court: I think I know the answer to this; but I just want to make sure on the record, you haven't gone to law school?
> [D.K.]: No, sir.
> The Court: Have you studied law?

6

[D.K.]: No, sir.

The Court: Do you understand that you are at a significant disadvantage by not being a lawyer if you represent yourself, specifically in that you don't know the Rules of Evidence and the Rules of Procedure?

[D.K.]: Yes, sir.

The Court: Do you understand that if I let you represent yourself that you will be held by those same Rules of Procedure and Rules of Evidence that everyone else will be held to?

[D.K.]: Yes, sir.

The Court: Do you understand that?

[D.K.]: Yes, sir.

. . .

The Court: Understanding that and understanding that you're going to be held to the same Rules of Procedure and Rules of Evidence, do you still want to represent yourself in this case?

[D.K.]: I do because I don't feel like nobody is going to fight for my kids like I am.

The Court: All right. Let me give you an example. You might fight for your kids, but it's like walking into a boxing ring with both of your hands tied behind your back.

You may want to get in there and fight, but you're not going to be able to hit anybody because your hands are tied behind your back. Does that make sense?

[D.K.]: Yes, sir.

The Court: Do you still want to get into this boxing ring and fight with your hands tied behind your back?

[D.K.]: No, sir. I do, but I don't. Yes, I do.

The Court: You do?

[D.K.]: (Nods head affirmatively.)

The Court: Okay. So you want me to let Ms. Kersey go?

[D.K.]: Yes.

. . .

The Court: . . . But there's a request that your rights be terminated. Do you understand that?

[D.K.]: Yes, sir.

The Court: And if your rights are terminated, do you understand that's termination for all time?

[D.K.]: Yes, sir.

. . .

The Court: Understanding all that, do you still want to proceed representing yourself?

[D.K.]: I do, but I don't because I really don't know all the law. All I know is what I know. I don't know if that's going to count for anything.

The Court: I don't know if it will or if it won't. I can't make this decision for you, [D.K.]. Only you can make that decision.

Ms. Kersey has brought it to my attention because we haven't started the evidence yet, and I'm giving you an opportunity to make that decision.

[D.K.]: I don't want to be stupid, but I want to do it.

The Court: You want to do it yourself?

[D.K.]: Yeah, I'll do it myself.

. . .

The Court: All right. Is anyone threatening you in any way or promising you anything to cut your attorney loose?

[D.K.]: No, sir.

The Court: You're freely and voluntarily doing this, and you want to represent yourself on your own?

[D.K.]: Yes, sir.

The Court: All right. Do you want to talk to your attorney one more time before we move forward, or are you ready to roll?

[D.K.]: I think I'm ready to go.

D.K.'s counsel, Toni Kersey, then interjected, stating that she had advised D.K. "of her Fifth Amendment right to refuse to answer for anything that could incriminate her." The trial court then discussed the right to remain silent with D.K. The trial court informed D.K. that she had the right to have an attorney appointed to represent her prior to responding to any questions that could incriminate her. The trial court again questioned D.K.:

The Court: . . . Do you understand that if I cut Ms. Kersey loose and allow you to represent yourself, if you get to the point where you believe that there's an answer that might incriminate you, you can

8

stop these proceedings and I'll appoint another attorney to come advise you with regard to that matter?

I know Ms. Kersey. I know she's here on my criminal docket, as well as my family docket, so I know she knows criminal law. But I'll appoint another attorney.

Do you understand that?

[D.K.]: Yes, sir.

After providing extensive admonishments to D.K., which encompassed approximately 14 pages of the reporter's record, the trial court stated: "Ms. Kersey . . . I will grant her request and release you."

Finally, after a short recess was taken during D.K.'s testimony at trial, the trial court declined to appoint new counsel to represent D.K.:

The Court: [D.K.], come on back up. I understand you had a question or something you want to ask me before we proceed.
[D.K.]: I wanted to see if I could get that lawyer.
The Court: Ma'am?
[D.K.]: If I can get that lawyer back.
The Court: You just let yours go.
[D.K.]: I know.
The Court: I'm not bringing her back. We've already started.
[D.K.]: I know.
The Court: That's why I went through all those questions with you.
[D.K.]: I know. We can just – I guess I'm – it's okay.
. . .
The Court: . . . But if you want to talk to them again, we can; and if you don't, we'll go ahead.
[D.K.]: We can go ahead.
The Court: You want to go ahead?
[D.K.]: Go ahead.

D.K. represented herself through the conclusion of the trial.

### D.K.'s Testimony

D.K. was the first witness called to testify. She testified that she is the biological mother of three boys: R.H., who was 13 years old at the time of trial; M.D.J., who was 11 years old; and M.K., who was 3 years old.

D.K. and her children lived with D.K.'s parents until their deaths in 2011. After their deaths, D.K. moved in with her sister-in-law, Tasha, where they lived in an apartment in Lake Jackson. D.K., M.D.J., and M.K. lived in Tasha's apartment for approximately six months; R.H. was living with his father. M.D.J. attended school during this time.

In 2012, D.K., R.H., M.D.J., and M.K. all moved to Cypress, where they lived in a house belonging to D.K.'s brother, James. They lived in James' house for approximately one year. At the time of trial, James was serving a five-year sentence in the Texas Department of Corrections, and he had other felony convictions prior to that time; James' convictions include aggravated robbery, assault with bodily injury, two counts of delivery of a controlled substance, two counts of possession of a controlled substance, and evading arrest.

Both R.H. and M.D.J. attended school while they lived in Cypress. Further, in approximately January or February of 2012, D.K. met R.H.'s teacher, Trenece Myers.

Toward the end of 2012, D.K. and her boys moved out of James' house and lived at a Motel 6, where they stayed for several weeks. In November 2012 they moved to Yorktown, where they stayed with D.K.'s brother, William, for several weeks. They went to Yorktown for a job opportunity for D.K. D.K. removed her boys from school in order to take them to Yorktown. Further, they lived with William even though he had multiple felony convictions, including a conviction for aggravated assault with a deadly weapon.

When the job opportunity in Yorktown failed to materialize, D.K. and her boys moved back to Cypress, where they once again stayed in the Motel 6. D.K.'s boyfriend, Marcus, also lived with them in the motel.

On January 24, 2013, D.K. signed a document providing temporary guardianship over R.H., M.D.J., and M.K. to Trenece Myers. She transferred custody of her boys to Myers because she was preparing to turn herself in to the county jail "for some outstanding tickets and warrants that [she] had." The outstanding warrants were for misdemeanor offenses, including altering a prescription and failing to appear. She informed Myers that it could take up to 45 days from the date she turned herself in to the jail before she was released from custody.

Myers took custody of R.H., who was then 11 years old, and M.D.J., who was 8 years old. Although D.K. had previously met Myers and Myers had

previously kept her children overnight and for "about two weeks," D.K. had never been to Myers' residence and she had only spoken to Myers' husband for approximately 10–20 minutes.

Another woman, Alexis White, took custody of M.K., who was only one year old, because Myers could not care for a one-year-old. D.K. did not know White; D.K. relied on Myers' relationship with White, as White was "one of [Myers'] real good family friends," as the basis for transferring custody of M.K. to White.

Both R.H. and M.D.J. remained out of school from November 2012, when they moved to Yorktown, until the end of January 2013, when Myers assumed custody over them.

After transferring guardianship of her children to Myers and White, but before turning herself in to the county jail, D.K. visited with R.H. and M.D.J. one time, for one hour at a McDonald's, and she visited with M.K. once, which was an overnight visit.

D.K. turned herself in to the county jail on January 29, 2013, and was released on February 16, 2013. Also on January 29, 2013, Myers called child protective services to report that D.K. had engaged in neglectful supervision of R.H., M.D.J., and M.K. After her release from jail, D.K. next visited with her children in March 2013.

D.K. also testified regarding her drug usage. She admitted to having taken hydrocodone from 2006 through 2013, which had been prescribed to her after she was in an automobile accident in 2006. She further admitted to taking marijuana, cocaine, and methamphetamines, beginning at some point in 2012. D.K. tested positive for methamphetamines, marijuana, and cocaine in March and April of 2013.

D.K. stopped using drugs at some point in 2013, but she relapsed while working at a nursing home in Lake Jackson. Further, she missed a court-ordered urinalysis in December 2013. And on April 1, 2014, she admitted to DFPS that she had used methamphetamine.

D.K. testified that she last used drugs on April 1, 2014; she had been sober since April 2, 2014. But she refused, when asked on multiple occasions, to identify the person or persons who provided her with the drugs.

D.K. had custody of her children, who were still living with her, when she began using drugs. She left her boys with her boyfriend while she was using the drugs. But, when asked if she "came back under the influence of drugs and [was] around [her] children," she replied: "Yes, sir."

Regarding caring for her children, D.K. testified that the boys had a pediatrician while they lived in Lake Jackson, which they left in 2011, and had not had a pediatrician since that time. And, although M.D.J. had febrile seizures

13

"when he was younger," she did not take him to the doctor because he "hadn't had a seizure since 2007," even though she was aware he could have additional seizures; the only reason D.K. provided for failing to take M.D.J. to the doctor for his seizures was that she "was in [her] addiction." Further, the boys did not have a dentist. In fact, D.K. never took R.H. to the dentist and M.D.J. had only been to the dentist twice, including once in 2010, when he went for pain that was caused by cavities. Finally, D.K. testified that M.D.J. had been held back a grade, because she had not kept him in school, and she admitted that failing to keep him in school was not in his best interest.

D.K. signed and understood the Family Service Plan. After signing the service plan, she missed her visits with her children for "a couple of weeks." She failed to take her drug and alcohol assessment within three months, and she failed to attend NA and AA classes, which she was required to attend weekly beginning when she signed the service plan, from March 2013 through March 2014, as she attended her first AA or NA meeting in April 2014. And she failed to maintain stable employment until June 10, 2014.

At the time of trial, D.K. was working at an internship, which she had started on June 10, 2014, and where she was earning $500 per month. Although she was employed, she did not provide support to her children. Further, she moved in to Perpetual Help Home, in Victoria, on April 2, 2014, and she was still living there

14

at the time of trial. The shelter, however, did not permit children over the age of 13 to reside at the shelter. Thus, although D.K. had "a support group there that is willing to help [her] find a place outside of there when the time is necessary," she could not live at the shelter with all of her children.

### Caseworker's Testimony

The DFPS caseworker, Trisha West, was the second witness to testify. West testified that it was in the best interest of the children for D.K.'s parental rights to be terminated. She further testified that DFPS was concerned, because the services required of D.K. had not been completed, "drug treatment [hadn't] even been started," and D.K. did not have a stable home.

### Guardian Ad Litem's Testimony

The guardian ad litem for the children, Christian Landry, also testified. Landry testified that both R.H. and M.D.J. "at separate times made the exact same allegations and outcries of staying in trucks, staying in hotels, having multiple men in the room, having their mom doing things with men, not having food, being hurt or not going to the doctor." When DFPS took custody of the children, they were aggressive, disrespectful, and far behind in school, and they needed medical attention. She further testified: "The children, where they are now, all of their needs are being met and exceeded. They have come so far in their schooling and their medical needs and their emotional stability. They're just in a really great

place." Landry stated that the "children are afraid to go back with their mother. They're afraid of having to live in a truck again. They're afraid of having the same situations happen." Further, "while they do love their mother, they don't want to go back to that situation ever."

M.D.J. was with his father, in a "great home," with siblings, and with the ability to see R.H. and M.K., "because the foster parent has said that they [sic] will facilitate that." R.H. and M.K. were with foster parents, who were willing to adopt. The foster mom "has put so much into both of those children. The church that she goes to put so much into those children. The coaches and the teachers at the school have also put a lot into [R.H.], especially."

R.H. needs constant supervision. M.K. has speech problems. "The foster mother has invested $6,000 to getting him into special private care to help with his speech, which has come so far, and help with his social skills, and for him to feel comfortable and work on his emotional issues."

The children were afraid that they would have to go back to their mother, which has hindered their ability to move on.

***M.D.J.'s Father's Testimony***

Finally, M.J., M.D.J.'s father, testified. M.J. testified that he was requesting that he be declared M.D.J.'s father and that he and his wife intended to adopt M.D.J.

## D.K.'s Representation

In her first three issues, D.K. argues that the trial court committed three separate reversible errors in relation to her right to counsel. D.K. contends that the trial court (1) erred by releasing D.K.'s attorney without finding good cause for relieving counsel of her duties and by releasing counsel "in the middle of trial"; (2) failed to appoint new counsel to represent D.K. when she requested counsel during trial; and (3) erred by granting a contest to D.K.'s affidavit of indigence after D.K. filed her notice of appeal.

### D.K. Cannot Complain That the Trial Court Released Counsel

In her first issue, D.K. argues that the trial court was required, by section 107.013 of the Texas Family Code, to appoint counsel to represent her and that the trial court lacked authority to allow counsel to withdraw, because the trial court did not make a finding of good cause for the withdrawal. D.K. contends that the trial court lacked authority to "grant D.K.'s 'request' that her attorney be released" and that D.K. was not "authorized to release her attorney." D.K. therefore concludes that "the trial court reversibly erred by allowing Kersey to withdraw without a finding of good cause on the record," and she further argues that "it was fundamentally unfair to release the attorney in the middle of trial."

Although there is no constitutional right to appointment of counsel in every parental termination proceeding, "Texas has adopted a higher standard by

mandating the appointment of an attorney ad litem for an indigent parent who opposes the termination of the parent-child relationship in a suit filed by a governmental entity." *In re A.H.L.*, 214 S.W.3d 45, 51 (Tex. App.—El Paso 2006, pet. denied); *see Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27–32, 101 S.Ct. 2153, 2159–62 (1981). Once appointed, an attorney must continue "to serve as an attorney ad litem for a parent" until either the "suit affecting the parent-child relationship is dismissed," the appeals related to the final order terminating parental rights are exhausted or waived, or "the attorney is relieved of the attorney's duties or replaced by another attorney after a finding of good cause is rendered by the court on the record." TEX. FAM. CODE ANN. § 107.016(2) (West 2014). The statute does not expressly provide an indigent parent with a right of self-representation. *See In re A.H.L.*, 214 S.W.3d at 51–52. But, if a trial court elects to permit a parent in a parental termination proceeding to proceed pro se, the trial court must inform the parent of the dangers of self-representation before permitting the parent to proceed pro se. *See In re C.L.S.*, 403 S.W.3d 15, 19–22 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

Here, the trial court appointed counsel, Kersey, to represent D.K. After the trial began, but before any evidence was presented, Kersey informed the trial court that D.K. wanted to represent herself. The trial court then admonished D.K. regarding the disadvantages of self-representation. Over the course of

18

approximately 14-pages of admonishments and discussion, D.K. told the trial court that she wanted to represent herself, which she reiterated numerous times, and she told the trial court that she wanted the trial court to let Kersey go. The trial court then stated that he would "grant [D.K.'s] request and release" Kersey.

By stating to the trial court that she wanted to represent herself and that she wanted the trial court to let Kersey go, D.K. asked the trial court to release Kersey and to allow D.K. to proceed pro se. And, because the "invited error" doctrine states that "a party cannot complain on appeal that the trial court took a specific action that the complaining party requested," D.K. may not complain on appeal that the trial court granted her request and released Kersey. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (per curiam); *see Prystash v. State*, 3 S.W.3d 522, 530–32 (Tex. Crim. App. 1999); *Johnson v. Harris Cnty.*, No. 01-14-00383-CV, 2015 WL 3485913, at *2–3 (Tex. App.—Houston [1st Dist.] June 2, 2015, no pet. h.) (mem. op.). Accordingly, we overrule D.K.'s first issue.[1]

---

[1] In her brief, D.K. relies on *In re E.A.F.* to support her argument that "the trial court reversibly erred by allowing Kersey to withdraw without a finding of good cause on the record." In that case, the Fourteenth Court of Appeals stated that the Family Code "deprives the trial court of the authority to permit the withdrawal of [an] attorney ad litem absent a finding of good cause" and does "not allow [an indigent parent] to release a court-appointed attorney ad litem." *In re E.A.F.*, 424 S.W.3d 742, 749 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Our sister court did not, however, address the application of the invited error doctrine as part of its analysis. Accordingly, because D.K. requested that the trial court allow her to proceed pro se and asked the trial court to release Kersey, we do not reach the issues addressed by our sister court and we do not consider whether in other circumstances the trial court could have erred by granting D.K.'s requests.

19

### *D.K. Waived Any Argument Regarding Appointment of New Counsel During Trial*

In her second issue, D.K. argues that the trial court "promised D.K. that he would stop the trial and appoint a new lawyer for her if she asked for one" and that the trial court erred by refusing to appoint counsel to represent her when she requested counsel during the trial.

As an initial matter, D.K. erroneously argues that the trial court "promised" her that he would appoint new counsel upon her request. Contrary to D.K.'s contention, the trial court informed D.K. that he would appoint new counsel to represent her if she believed that an answer to a question posed to her might incriminate her. But when D.K. requested new counsel during trial, no question which might have elicited an incriminating response had been posed to her.

More importantly, D.K. provides no citations to legal authority and merely provides a brief, conclusory statement to support her argument for her second issue. Accordingly, by failing to provide sufficient argument and authorities to support issue two, D.K. has waived this issue. *See* TEX. R. APP. P. 38.1(i); *Abdelnour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241–42 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

Accordingly, we overrule appellant's second issue.

20

***Any Error In the Trial Court's Order Sustaining a Contest to D.K.'s Affidavit of Indigence Is Moot***

In her third issue, D.K. argues that the trial court reversibly erred when it sustained a contest to her affidavit of indigence. In support of her argument, D.K. contends that the contest to her affidavit of indigence was not timely filed and that "the contest did not contain required specifics about a good faith belief that D.K.'s circumstances had materially and substantially changed." D.K. further contends that the order "improperly nullified the presumption of indigence to which D.K. was entitled."

A parent in a parental termination proceeding who claims indigence for the purposes of receiving appointed counsel "must file an affidavit of indigence in accordance with Rule 145(b) of the Texas Rules of Civil Procedure before the court can conduct a hearing to determine the parent's indigence under this section." TEX. FAM. CODE ANN. § 107.013(d) (West 2014). If the parent files an affidavit of indigence and the trial court determines that the parent is indigent, the trial court must appoint an attorney ad litem to represent the parent's interests and the parent is presumed to remain indigent for the duration of the suit and any subsequent appeal unless a motion for reconsideration is filed. *See id.* § 107.013(a)(1), (e); TEX. R. APP. P. 20.1(a)(3). Nevertheless, the clerk, the court reporter, or any party may challenge the presumption that the parent remains indigent for purposes of appeal by filing a contest in the trial court, which "contest must be filed within

21

three days after a notice of appeal is filed." TEX. R. APP. P. 20.1(e)(2). If a contest is filed, the trial court must hold a hearing and determine whether the parent remains indigent. *See* TEX. R. APP. P. 20.1(i). Further, "[i]f the trial court sustains a contest, the party claiming indigence may seek review of the court's order by filing a motion challenging the order with the appellate court without advance payment of costs." TEX. R. APP. P. 20.1(j)(1). Such a motion must be filed within 10 days after the order sustaining the contest is signed or the notice of appeal is filed, whichever is later. *See* TEX. R. APP. P. 20.1(j)(2).

Here, the trial court found D.K. indigent on February 4, 2013, and appointed counsel to represent her. After the trial court rendered judgment against her, D.K., through counsel, Blair Parker, timely filed a notice of appeal on October 28, 2014. Both the court reporter and DFPS filed contests to D.K.'s affidavit or presumption of indigence, and the trial court signed an "Order Granting Contest to Affidavit of Indigence" on December 8, 2014. D.K. did not, however, file a motion challenging the trial court's order sustaining a contest to her affidavit or presumption of indigence. Based on D.K.'s failure to file a motion challenging the trial court's order, this court determined, in an order issued February 3, 2015, that D.K. is not indigent for purposes of appellate costs.

"The test for determining indigence is straightforward: 'Does the record as a whole show by a preponderance of the evidence that the applicant would be unable

22

to pay the costs, or a part thereof, or give security therefor, if [s]he really wanted to and made a good-faith effort to do so?" *In re C.H.C.*, 331 S.W.3d 426, 429 (Tex. 2011) (quoting *Higgins v. Randall Cnty. Sheriff's Office*, 257 S.W.3d 684, 686 (Tex. 2008)). The rules of procedure allow for litigants to establish their indigence in order to obtain access to the courts "without advance payment of costs." *E.g.*, TEX. R. APP. P. 20.1(a)(3).

In this case, the appellate filing fees have been paid, the clerk's record was filed on November 7, 2014, the reporter's record was filed on March 30, 2015, and D.K.'s amended brief, filed by counsel, Janice Berg, was filed on May 1, 2015. Because (1) counsel Parker filed a motion for new trial on D.K.'s behalf and represented her at the new trial hearing, (2) counsel Berg filed an appellate brief on D.K.'s behalf and continues to represent her, and (3) the complete appellate record has been filed, any error in the trial court's order sustaining a contest to D.K.'s affidavit or presumption of indigence has been rendered moot.

Accordingly, we overrule appellant's third issue.

### Sufficiency of the Evidence

In her fourth through sixth issues, D.K. argues that the evidence is legally and factually insufficient to support the trial court's findings that she (1) allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, (2) engaged in conduct that

23

endangered the physical or emotional well-being of her children, and (3) failed to comply with the provisions of a court order that established the actions necessary for her to obtain the return of her children from DFPS's conservatorship. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (1)(E), (1)(O). Further, in her seventh issue, she contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the children's best interest. *See id.* §161.001(2).

*Standard of Review*

A parent's natural right to the "companionship, care, custody, and management" of his or her children is of constitutional dimension and is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *accord In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) (quoting *Santosky*); *see Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between parents and their children except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *See id.* However, "the rights of natural parents are not absolute," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*,

24

113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights under section 161.001, the Department must prove, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344 (quoting TEX. FAM. CODE ANN. § 101.007 (West 2014)). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. Thus, if the trial court's judgment relies on multiple predicate grounds, we may affirm on any one of those grounds. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental-rights-termination case under section 161.001, we look at all the evidence to determine

whether the evidence, viewed in the light most favorable to the finding, is such that the factfinder could reasonably have formed a firm belief or conviction about the truth of the issues on which DFPS bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We defer to the trial court as fact-finder and resolve disputed facts in favor of its finding if a reasonable factfinder could do so. *See In re J.F.C.*, 96 S.W.3d at 266; *Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Termination findings withstand a factual sufficiency challenge if the evidence is such that a reasonable factfinder could form a firm belief or conviction that the statutory grounds for termination exist. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). To reverse a case on factual insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 19.

### *Evidentiary Sufficiency That D.K. Engaged in Endangering Conduct*

In her fifth issue, D.K. contends that the evidence is legally and factually insufficient to support termination of her parental rights under Texas Family Code section 161.001(1)(E). This provision provides a basis for terminating parental rights because of child endangerment. "'To endanger' means to expose a child to

loss or injury or to jeopardize a child's emotional or physical health." *Jordan*, 325 S.W.3d at 723; *accord In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)).

"Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987); *see also In re J.O.A.*, 283 S.W.3d at 345 (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining that relevant conduct may occur either before or after child's removal from home).

Under subsection 161.001(1)(E), a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). The parent's conduct must cause the endangerment, and the endangerment must be the result of a voluntary,

27

deliberate, and conscious course of conduct by the parent rather than a single act or omission. *Jordan*, 325 S.W.3d at 723; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct does not, however, have to be directed at a specific child, as "the manner in which a parent treats other children in the family can be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child." *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The relevant inquiry is whether evidence exists that the parent's conduct— including acts, omissions, and failures to act—directly endangered the child's physical well-being. *See In re J.T.G.*, 121 S.W.3d at 125; *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex. App.—Fort Worth 2001, no pet.). Parental conduct may be relevant even if it does not involve the child or result in actual harm to the child. *See Boyd*, 727 S.W.2d at 533–34; *In re D.M.*, 58 S.W.3d at 811.

DFPS presented evidence that, beginning in 2011, D.K. lacked stable housing for herself and her children. From 2011 through January 2013, D.K. and her children lived with D.K.'s sister-in-law, with her brother James, in a Motel 6, with her brother William, back in the Motel 6, and, at some points, in a vehicle. When D.K. and her children were living with D.K.'s brothers they were living with convicted felons; James has convictions for aggravated robbery, assault, delivery

of a controlled substance, and possession of a controlled substance, and William has a conviction for aggravated assault. Further, the children told the ad litem that D.K. would have multiple men in the room when they stayed in hotels, and she would do things with the men. Further, D.K. still lacked stable housing at the time of trial, as she was staying in Perpetual Help Home, which does not permit children over the age of 13 to reside in the home and is therefore not a suitable home for R.H.

D.K. also failed to properly tend to her children's medical needs. The evidence shows that D.K.'s children did not have a pediatrician and had not had one since 2011. D.K. did not take the children to a doctor, even though M.D.J. had suffered from febrile seizures. The children also did not have a dentist; R.H. had never been to a dentist, and M.D.J. had only been to the dentist for pain, when he had cavities. Moreover, the children made "allegations and outcries of . . . not having food, being hurt or not going to the doctor."

D.K. did not obtain stable employment until June 10, 2014, which was more than 16 months after DFPS became involved in the case and less than four months before she testified at the trial. Further, D.K. testified that, although she was employed, she did not provide support to her children.

D.K. admitted that she was incarcerated for a short time in late January and early February 2013. Further, during her incarceration, she assigned temporary

guardianship over her children to Trenece Myers, whom she barely knew, and she left R.H. and M.D.J. with Myers and Myers' husband, who was an almost complete stranger to D.K. D.K. then left M.K. with Alexis White, whom D.K. had never even met, based solely on the recommendation of Myers.

D.K. removed R.H. and M.D.J. from school in November 2012, and the children had not returned to school by the time she assigned guardianship over the children to Myers. M.D.J. was later held back a grade.

Finally, D.K. admitted to taking hydrocodone from 2006 through 2013, and she admitted to using methamphetamine, marijuana, and cocaine between 2012 and April 1, 2014. D.K. claimed to have stopped using at some point in 2013, but she admitted to relapsing. Although she contended that she never used drugs around her children, she conceded that she came home and was around her children while under the influence of drugs. She failed to attend AA or NA meetings, as required by her Family Service Plan, from March 2013 through March 2014, and she failed to take her drug and alcohol assessment as directed. And she refused, upon repeated questioning, to identify any person or persons who had provided her with the drugs.

"Narcotics use, in some circumstances, may give rise to termination under section 161.001(1)(E)." *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see In re J.O.A.*,

30

283 S.W.3d at 345; *Walker*, 312 S.W.3d at 617–18; *In re S.N.*, 272 S.W.3d at 52. And "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d at 346; *see Toliver*, 217 S.W.3d at 98.

Further, although failure to maintain stable housing will not, by itself, sustain a finding under subsection 161.001(1)(E), "[f]ailure to maintain a stable home, combined with failure to provide for the children's needs, may also support a finding under subsection 161.001(1)(E)." *In re J.R.*, 171 S.W.3d 558, 578 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Similarly, imprisonment, standing alone, does not constitute endangering conduct, but "[i]t is a fact properly considered . . . on the issue of endangerment," and DFPS "need only show incarceration was part of a course of conduct endangering the child." *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00598-CV, 2003 WL 22096141, at *14 (Tex. App.—Austin Sept. 11, 2003, no pet.) (mem. op.); *see Boyd*, 727 S.W.2d at 533–34. And the failure to tend to children's medical needs and ensure that they are attending school can also be considered when evaluating a parent's course of conduct that endangers the children. *See Smith*, 2003 WL 22096141, at *14.

Therefore, viewing all of the evidence in this case in a light most favorable to the trial court's findings, we hold that a reasonable factfinder could form a firm belief or conviction that D.K. engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.L.*, 163 S.W.3d 79, 87 (Tex. 2005); *see also Smith*, 2003 WL 22096141, at *14 ("When this evidence is coupled, however, with the evidence demonstrating [mother's] failure to ensure that her two older girls were attending school and both [mother's] and [father's] use of drugs and their resulting incarcerations, we cannot say that a reasonable fact finder could not have formed a firm belief or conviction that the children were endangered by the [parents'] conduct."). Accordingly, we overrule appellant's fifth issue.

### *Evidentiary Sufficiency That D.K. Placed the Children in Endangering Surroundings And That D.K. Failed to Comply With a Court Order*

Because we conclude that the evidence is both legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), and because a finding as to any one of the acts or omissions enumerated in section 161.001(1) is sufficient to support termination, we need not address D.K.'s fourth issue challenging the trial court's findings under section 161.001(1)(D) or D.K.'s sixth issue challenging the trial court's findings under section 161.001(1)(O). *See In re A.V.*, 113 S.W.3d at 362; *In re D.S.*, 333 S.W.3d at 388; *Walker*, 312 S.W.3d

at 618; *In re S.N.*, 272 S.W.3d at 49. However, we must still determine whether the evidence was sufficient to support the trial court's finding that termination was in the children's best interest, pursuant to section 161.001(2).

*Evidentiary Sufficiency of Best-Interest Findings*

In her seventh issue, D.K. contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in her children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2).

A strong presumption exists that a child's best interest is served by maintaining the parent–child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for

33

the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

*The Children's Desires*

The guardian ad litem for the children, Christian Landry, testified that the "children are afraid to go back with their mother" and that, "while they do love their mother, they don't want to go back to that situation ever."

*The Children's Present and Future Emotional and Physical Needs*

"[T]he need for permanence is a paramount consideration for the child[ren]'s present and future physical and emotional needs." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). "The goal of establishing a stable, permanent home for a child is a compelling government interest." *Id.* Further, a "fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future." *Id.*

Here, D.K. did not provide a stable home for her children from 2011 through 2013, and she still did not have stable housing at the time of trial. She moved the

children between schools and school districts, and she removed them from school altogether for several months.

Further, Landry testified that, when DFPS took custody of the children, they were aggressive, disrespectful, far behind in school, and in need of medical attention. At the time of trial, when R.H. and M.K. had been placed with a foster family and M.D.J. had been placed with his father, all of the children's needs "[were] being met and exceeded," they were progressing in school, their medical needs were being met, and their emotional stability was improving.

Landry testified that M.D.J. lives with his father, in "a great home." R.H. and M.K. are with a foster family that is willing to adopt them. R.H. needs constant supervision, and M.K. has speech problems. The foster mom has "put so much into both of those children," her church has also "put so much into those children," and the coaches and teachers at school have as well, especially with R.H. The foster mom has also invested in obtaining special private care to help M.K. with his speech, his social skills, and his emotional issues.

Finally, D.K. told the children, on multiple occasions, that they would be returning to live with her, which has hindered their ability to move on emotionally, and the children are afraid to return to D.K.

*Present and Future Emotional and Physical Danger to the Children*

Evidence of illegal drug use by a parent is "relevant in determining whether a parent poses a present or future risk of physical or emotional danger to" her children. *In re S.N.*, 272 S.W.3d at 52; *see also In re J.D.*, 436 S.W.3d at 118 ("The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child.").

Here, D.K. admitted to taking hydrocodone from 2006 through 2013 and to using methamphetamine, marijuana, and cocaine from 2012 through April 2014. She further admitted to being under the influence of drugs in the presence of her children.

*Parental ability and programs available to assist in promoting the children's best interests*

"A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest." *In re J.D.*, 436 S.W.3d at 119 (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)).

D.K. lacked a stable home from 2011 through 2013, and she continued to lack a stable home suitable for her children at the time of trial. She also lacked

stable employment until June 10, 2014.  Moreover, even after obtaining stable employment, she earned $500 per month and failed to provide any support to her children.

Further, the evidence at trial shows that D.K. relied on other people to support her children: her brothers, her sister-in-law, and her boyfriend.  She also did not take the children to a doctor, such that they were in need of medical attention when DFPS took custody over them and M.K. had developed speech problems.

Finally, D.K. displayed poor judgment regarding the children by returning home to the children while under the influence of drugs and by removing the children from school in November 2012 and failing to register them for another school before turning over guardianship of the children to Myers at the end of January 2013.

*Plans for the Child and Stability of the Home or Proposed Placement*

When considering the best interest of the child, the stability of the proposed home environment is an important consideration and the fact finder may compare the proposed plans for the children by the parent and by DFPS and may consider whether the plans are realistic or weak and ill-defined.  *See In re J.D.*, 436 S.W.3d at 119–20.  "Stability and permanence are paramount in the upbringing of the children."  *Id.* at 120.

Because D.K. was living at Perpetual Help Home, which prohibits children over the age of 13 from staying at the home, she lacked stable and permanent housing at the time of trial. Further, the only evidence of plans for the children D.K. offered at trial was her testimony that she had a support group at the Perpetual Help Home "that is willing to help [her] find a place outside of there," where she could live with her children, "when the time is necessary."

By contrast, M.D.J.'s father requested that he be declared M.D.J.'s father and testified that he and his wife intended to adopt M.D.J. And DFPS provided evidence, through Landry's testimony, to show that M.D.J. was in a "great home" with his father, that he was with siblings, and that he would be able to visit R.H. and M.K. Landry also testified that R.H. and M.K. were with foster parents who were willing to adopt them and that the foster mom, her church, and the coaches and teachers at the children's school had invested significantly in R.H. and M.K. The foster mom had also paid for special private care to help M.K. with his speech problems, his social skills, and his emotional issues.

*The acts or omissions of the parents and any excuse for such acts or omissions*

As discussed above, D.K. used drugs, lacked stable housing, resided with a drug dealer and felons, failed to provide support for her children, failed to take her children to the doctor, removed her children from school, and assigned temporary guardianship over her children to virtual strangers. D.K. explained the lack of

38

stable housing and the drug usage by pointing to her parents' deaths in 2011, which put her in a state of depression. She lived with a drug dealer because he is her brother and she's "not really paying attention to all the mistakes he's made," and she is willing to overlook the crimes her family members have committed because they are her family and she loves them. She failed to take her children to the doctor because she "was in [her] addiction" to drugs. She removed her children from school because she moved to another school district, where her job opportunity did not work out, and she did not re-enroll her children in school because she mistakenly believed she needed a permanent address to enroll them in school and she did not have a permanent address. Finally, she assigned temporary guardianship of her children to Myers because she needed someone to watch her children while she was incarcerated after she turned herself in for her outstanding warrants and tickets, and she had known Myers for over one year, Myers had been R.H.'s teacher and was therefore a schoolteacher, and she believed Myers could enroll them in school.

*Conclusion*

In sum, considering all of the evidence in a neutral light, we hold that the evidence is such that the trial court could have formed a firm conviction or belief that termination of D.K.'s parental rights was in the children's best interest. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A

39

parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child."); *see also In re J.D.*, 436 S.W.3d at 116–21; *In re S.N.*, 272 S.W.3d at 51–54; *Toliver*, 217 S.W.3d at 101–02, 103–04. Accordingly, we overrule D.K.'s seventh issue.

## Appointment of Sole Managing Conservators

In her eighth and ninth issues, D.K. challenges the sufficiency of the evidence to support the trial court's findings that appointment of DFPS as managing conservator of R.H. and M.K. was in the best interest of R.H. and M.K. and that appointment of M.D.J.'s father as managing conservator of M.D.J. was in the best interest of M.D.J.

Texas Family Code section 153.131 creates a rebuttable presumption that the appointment of a child's parents as joint managing conservators is in the child's best interest. *See* TEX. FAM. CODE ANN. § 153.131(b) (West 2014). Section 153.131 further requires the trial court to appoint a parent as the sole managing conservator or to appoint both parents as joint managing conservators of a child, unless the court finds that appointment of the parent or parents would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development. *See id.* 153.131(a). Nevertheless, if a trial court terminates the parent-child relationship with respect to both parents or to

the only living parent, the court is required by Family Code section 161.207 to appoint a suitable, competent adult, DFPS, or a licensed child-placing agency as managing conservator of the child. TEX. FAM. CODE ANN. § 161.207(a) (West 2014). The trial court's conservatorship decisions are reviewed under an abuse of discretion standard, "and they may be reversed only if the decision is arbitrary and unreasonable." *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)). We review the trial court's conservatorship decision under a less stringent standard of review than the standard for termination. *See In re J.A.J.*, 243 S.W.3d at 616; *In re A.C.*, 394 S.W.3d at 644.

There is no evidence in the record to show that the appointment of M.D.J.'s father as managing conservator of M.D.J. would significantly impair M.D.J.'s physical health or emotional development. Further, the parental rights of both R.H.'s father and M.K.'s father were revoked, and those revocations have not been challenged on appeal. Finally, DFPS presented evidence that the foster parents had provided a stable and healthy environment for R.H. and M.K. *See In re A.C.*, 394 S.W.3d at 644.

Therefore, having already determined that the evidence supports the trial court's finding that termination of D.K.'s parental rights was in the children's best

interest, we conclude that the evidence is sufficient to support the trial court's findings that appointment of M.D.J.'s father as sole managing conservator of M.D.J. is in M.D.J.'s best interest and that appointment of DFPS as sole managing conservator of R.H. and M.K. is in the best interest of R.H. and M.K. Accordingly, we overrule appellant's eighth and ninth issues.

## Conclusion

Based on the foregoing, we affirm the judgment of the trial court.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.